SEALED
ORDERED UNSEALED on 07/25/2024   s/ melodyqui

FILED
Jun 11 2024
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY     s/ VeronicaCota     DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br>v.<br><br>Hugo LEVER, and<br>Juan GONZALEZ-Fonseca,<br><br>       Defendants. | Case No.:  24MJ8521<br><br>COMPLAINT FOR VIOLATION OF<br><br>Title 18 U.S.C.§§ 2, 1956(a)(2)(B)(i), 1956(a)(3)(B), and 1956(h)- Conspiracy to launder monetary instruments; and Laundering monetary instruments and aiding and abetting |

The undersigned complainant duly sworn states:

COUNT ONE

Beginning on a date unknown, and continuing up to and including October 31, 2019, within the Southern District of California and elsewhere, Defendants Hugo LEVER and Juan GONZALEZ-Fonseca did knowingly and intentionally conspire and agree together and with each other, and with other persons known and unknown to commit offenses against the United States, to transport, transmit, and transfer a monetary instrument and funds from a place in the United States to or through a place outside of the United States, knowing that the monetary instrument and funds involved in the transportation, transmission and transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission and transfer was designed in whole or in part to conceal and disguise the nature, location, the source, the ownership, and the control of the proceeds of specified unlawful activity, that is the distribution of controlled substances, in violation of Title 18, United States Code, Section

1956(a)(2)(B)(i); and with the intent to conceal and disguise the nature, location, source, ownership and control, of property believed to be the proceeds of specified unlawful activity, did knowingly conduct and attempt to conduct a financial transaction affecting interstate or foreign commerce involving property represented by a law enforcement officer to be proceeds of specified unlawful activity, that is the distribution of controlled substances, in violation of Title 18, United States Code, Section 1956(a)(3)(B);

All in violation of Title 18, United States Code Section 1956(h).

## COUNT TWO

From on or about July 8, 2019 to on or about July 17, 2019, in the Southern District of California and elsewhere, Defendants Hugo LEVER and Juan GONZALEZ-Fonseca, with the intent to conceal and disguise the nature, location, source, ownership and control, of property believed to be the proceeds of specified unlawful activity, did knowingly conduct and attempt to conduct a financial transaction affecting interstate or foreign commerce, namely the wire transfer of $85,500 in U.S. currency, initiated by the delivery of $100,000 in U.S. currency involving property represented by a law enforcement officer to be proceeds of specified unlawful activity, that is the distribution of controlled substances, in violation of Title 18, United States Code, Sections 1956(a)(3)(B) and 2.

This complaint is based on the facts in the attached probable cause statement, which is incorporated herein by reference.

*Nicole Macri*
_____
Nicole M. Macri, Special Agent
Drug Enforcement Administration

Sworn and attested to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1, this 11th day of June, 2024

_____
HON. LUPE RODRIGUEZ, JR.
UNITED STATES MAGISTRATE JUDGE

UNITED STATES OF AMERICA,

    v.

Hugo LEVER, and

Juan GONZALEZ-Fonseca

## Probable Cause Statement

### Agent's Training and Experience

    1.    I am a Special Agent with the Drug Enforcement Administration, ("DEA") and have been since August 7, 2015. I am currently assigned to the DEA Imperial County District Office ("IDCO"). Prior to that, I was assigned to the DEA Long Island District Office, New York Division Office. Before my employment with the DEA, I obtained a Bachelor of Science degree in Criminal Justice in 2006 and worked as an accountant for approximately 10 years. I am a graduate of the DEA academy in Quantico, Virginia and have attained additional relevant training and experience through specialized courses at the DEA academy, including those pertaining to criminal investigations, illegal trafficking of narcotics, currency, firearms, and contraband.

    2.    I am presently assigned to the DEA's Imperial Country District Office (ICDO) which is situated along the Southwest Border of the United States of America directly north of Mexicali, Baja California, Mexico. During this assignment I have investigated individuals and Drug Trafficking Organizations (DTOs) based in Mexicali that import controlled substances into the United States from Mexico for further domestic distribution. I have been involved in several investigations involving individuals and organizations involved in drug trafficking and related monetary offenses including money laundering. As a case agent or co-case agent investigating drug trafficking offenses, I have often focused on identifying the transfer of funds to procure drugs from Mexico-based sources of supply and tracing the monetary value generated through the sale of controlled substances in the United States and how the generated illicit precedes are transferred through the financial system back to Mexico. In connection with my official DEA duties, I investigate criminal violations of federal drug laws and related offenses, including violations of Title

4

21, United States Code, 801 et seq. and the Federal Controlled Substance Act. I have received training, both formal and informal.

3.  I have also participated in investigations in which drug traffickers and money launders relied heavily upon telephone communication to include the use of encrypted messaging applications, such as WhatsApp, e-mail services, social media platforms, such as Facebook, and cellular phones to communicate with associates and co-conspirators. To that end, I have been the affiant to obtain court orders for Title-III wiretaps, and search warrants for physical residences, cellular phones, social media accounts, email accounts, prospective GPS location data, and historical cell site location data. Additionally, I have been the affiant to obtain court orders for the seizure of bank accounts involved in the laundering of drug proceeds.

4.  Based on my training and experience as a DEA Special Agent, I am familiar with the ways in which drug smugglers and traffickers conduct their business. During the course of my duties, I have specifically (1) worked as a case agent, directing specific drug-related investigations; (2) worked as a surveillance agent who observed and recorded movements of individuals suspected of trafficking drugs; (3) participated in the execution of search warrants related to drug investigations; (4) initiated and executed numerous arrests for drug-related offenses, including possession with the intent to distribute; and (5) interviewed criminal defendants, witnesses, and informants in furtherance of investigations into the illegal smuggling and trafficking of federally controlled substances. Through these duties, I have gained a working knowledge and insight into the operational habits of drug smugglers and traffickers.

5.  Through my investigations, my training and experience, and discussions with other law enforcement personnel, including Special Agents and financial investigators from the DEA, Internal Revenue Service Criminal Investigations Division (IRS-CI), Federal Bureau of Investigation (FBI) and Homeland Security Investigations (HSI), I have become familiar with the tactics and methods used by international criminal organizations to traffic controlled substances, to collect and launder the proceeds from the sale of controlled substances and how these illicit tactics and methods to launder drug proceeds notably deviate from how legitimate commerce

occurs in the global financial system. Specifically, I am aware that DTOs frequently use the serial number of a dollar bill as a means to authenticate the transfer of bulk cash from DTO members in domestic drug distribution locations to MLO money couriers who facilitate the laundering of drug proceeds back to Mexico-based DTO associates and leadership.

6. These facts are based on my personal participation in this investigation and on written and verbal statements received from other law enforcement officers. I submit that the facts contained in this statement demonstrate that probable cause exists to believe that the defendant named in the attached complaint committed the crime charged in the complaint. Because this affidavit is being submitted for the limited purpose of requesting a complaint and arrest warrant, I have not included all facts from the investigation but only those to support this request. All dates, times, and amounts included in this complaint are approximate.

## A.  BACKGROUND OF THE INVESTIGATION

7. The DEA is investigating the money laundering activities of Defendants Hugo LEVER and Juan GONZALEZ-Fonseca who are involved in laundering drug proceeds. As set forth below, Defendants LEVER and GONZALEZ initially met with undercover law enforcement in May 2019 and later picked up approximately $100,000 U.S. currency represented to be drug proceeds from undercover law enforcement on July 9, 2019. Defendant LEVER charged a money laundering commission of approximately 14.5% commission rate to launder that money, and on July 17, 2019, wire transferred approximately $85,500 U.S. dollars to an undercover bank account.

**B.    MAY 2019 - DEFENDANTS DISCUSS FUTURE MONEY LAUNDERING TRANSACTION INVOLVING $100K REPRESENTED TO BE DRUG PROCEEDS**

8.     In May 2019, a confidential source (CS)[1] identified LEVER and GONZALEZ and another individual as money launderers who were laundering drug proceeds domestically and internationally using concert and event promotion companies. The CS described LEVER as the Chief Executive Officer (CEO) of a promotion company, and GONZALEZ as a business partner. The CS stated GONZALEZ tasked the CS with finding investors located in the United States to fund a popular music festival in Ensenada, Mexico hosted by famous U.S. artists. California Corporate records revealed LEVER is the CEO of DA Music Entertainment with an address listed in Calexico, CA. In addition, LEVER is listed as the President and CEO of Red House Creative. Records indicated Redhouse Creative has a virtual office located in San Diego and a physical mailing address in El Centro, CA. Further a search of LEVER in California Department of Motor Vehicles which revealed LEVER is assigned a California driver's license with an address in Calexico, CA. In addition, through open source queries, agents identified a LinkedIn account for LEVER which showed a photograph of LEVER dressed in a suit and tie and listed him as the CEO at DA Music Entertainment.

9.     On May 15, 2019, the CS arranged a meeting the next day with GONZALEZ and another individual at a restaurant in Del Mar, CA. On the same date, the CS informed agents that the other individual had cancelled at the last minute and the meeting would be with LEVER and GONZALEZ.

10.    On May 16, 2019, LEVER and GONZALEZ met with a DEA Special Agent acting

---

[1] The Confidential Source (CS) has cooperated with DEA since approximately 2010, but was deactivated in approximately 2012 following an arrest for an unauthorized narcotics transaction. Those charges were later dismissed due to CS's cooperation. In 2011, CS fled from Mexico for his/her safety and crossed into the United States at a POE where he/she was encountered by immigration without the proper documentation to enter into the U.S. In approximately 2013, CS was reactivated as a confidential source. CS's cooperation has led to numerous arrests, money seizures, and narcotic seizures. CS's primary motivation is financial compensation, and has received approximately $624,540 in payment, and has received immigration benefits. CS is reliable to the extent that CS's information has been corroborated.

in an undercover capacity [hereinafter referred to as UC1] and the CS at Brigantine Seafood and Oyster bar in Del Mar, California. Agents observed a Nissan Sentra bearing Sonora Mexico plate (WFF-82-24) (hereinafter referred to as the "Sentra") occupied by LEVER and GONZALEZ parked in the restaurant parking area. LEVER and GONZALEZ went inside the restaurant, and at the beginning of the meeting LEVER introduced himself to UC1 as an event promoter. During the meeting, UC1 told LEVER that UC1 was interested in investing $100,000 USD to start. UC1 specified that UC1 was a narcotics trafficker who needed $100,000 of illicit proceeds laundered. UC1 stated, "I need you to understand where my earnings come from narco-trafficking, I was born for this, I am clean. If you guys come to this family just wanted to let you know there won't be any problems." UC1 asked LEVER and GONZALEZ if they were interested in the investment knowing they were derived from the sale of narcotics proceeds. Both LEVER and GONZALEZ stated they were still interested and had no issues receiving the money. LEVER extended his hand for a handshake and stated he was no one to judge. LEVER stated he saw this as a business transaction where LEVER and UC1 were business partners. LEVER explained how he uses his business, DA Music Entertainment and its subsidiaries, to launder proceeds.

11.    UC1 asked LEVER how he (LEVER) would like to coordinate receipt of the bulk currency. LEVER stated the money drop was up to UC1, however, LEVER mentioned he was willing to receive the bulk currency at a hotel. After receiving the bulk currency, LEVER stated the money is then deposited into different promotion companies to finance the concerts and front payment to the performing artists. LEVER stated he works with two financial institutions in Mexico, Proaktiva and Cualli, to launder money. LEVER stated Proaktiva is located in Mexicali, Mexico and Cualli is located in Mexico City, Mexico. Furthermore, LEVER stated he is also capable of laundering money through an Arizona based company. Based on my training and experience, I am aware that promotion companies involved in criminal activities facilitate money laundering schemes by comingling legitimate sponsor funds with drug proceeds. I am also aware that concert promotors involved in these schemes over-invoice the amount of money required to contract artists, rent venues, advertise events, secure sponsors, and generate ticket sales, which

provides additional laundering opportunities and a low risk of detection.

12. Following the concert, LEVER stated UC1's $100,000 USD investment would generate a 20% return on investment using Proaktiva and/or Cualli. LEVER stated he personally guaranteed the investment. LEVER stated this money laundering scheme and return on investment takes approximately 3-6 months to receive payment. LEVER stated the 'clean' money is then deposited into any account(s) UC1 provides.

13. UC1 positively identified the image posted for LEVER on his LinkedIn account as the individual that UC1 met at the restaurant. Further, agents subsequently ran crossing records through Customs and Border Patrol (CBP) databases of the vehicle bearing license plate WFF-82-24 and confirmed that GONZALEZ and LEVER had entered the United States through the Calexico East Port of Entry at approximately 8:00 a.m. that morning. A DEA Special Agent on the surveillance team reviewed photos of LEVER and FONSECA associated with the Sentra border crossing that day and confirmed they were the same individuals who met with UC1.

### C. JULY 2019 - DEFENDANTS PICK UP $100K REPRESENTED TO BE DRUG PROCEEDS

14. On July 8, 2019, UC1 advised LEVER that UC1's associate [UC2] would contact LEVER to schedule delivery of the $100,000 USD previously discussed during their May 16, 2019 meeting. On July 8, 2019, LEVER subsequently provided UC1 with the serial number [C2916906] from a Mexican peso [bill] that LEVER selected that would later be given to UC2. A bill/currency with serial number known to both parties (source of the currency and courier receiving the currency) is often used as the coded language and/or form of confirmation during bulk currency deliveries. Traffickers often use this method in order to verify the individual receiving the currency is correct and not an imposter attempting to steal from the organization.

15. On July 9, 2019, UC2 contacted LEVER by phone and advised that UC2 would meet LEVER at a Home Depot parking lot located in El Cajon, CA. (The CS was not present for this meeting.)

16. At approximately 1:30 p.m., agents observed the Sentra, the same vehicle observed on May 16, 2019 when UC1 met with LEVER and GONZALEZ at the restaurant, enter the Home Depot parking lot. Agents confirmed the vehicle was occupied by two individuals, later identified as LEVER and GONZALEZ.

17. Law enforcement databases would further confirm the Sentra had crossed the Calexico East Port of Entry (POE) that morning at approximately 8:46 a.m., occupied by both LEVER and GONZALEZ.

18. At approximately 1:31 p.m., LEVER contacted UC2 and advised that they were at the Home Depot. At approximately 1:35 p.m., UC2 called LEVER asking for confirmation of the vehicle LEVER was driving. LEVER confirmed a blue Nissan Sentra. UC2 then asked that LEVER meet UC2 at the Best Buy located nearby. LEVER subsequently asked UC2 what vehicle he was driving. UC2 confirmed a Range Rover.

19. Law enforcement aerial surveillance then observed the Sentra depart the Home Depot parking lot and drive to the Best Buy parking lot. At approximately 1:55 p.m., UC2 arrived at the meet location and parked at the nearby Office Depot parking lot. After a failed call to LEVER by UC2, at approximately 1:58 p.m., LEVER called UC2. UC2 confirmed he was parked at the Office Depot and LEVER in turn stated that they were parked at the Best Buy and would drive to UC2. UC2 then asked for confirmation that LEVER would have the bill with serial number. LEVER stated he did.

20. At approximately 2:00 p.m., agents observed the Sentra depart the Best Buy lot and park next to UC2's vehicle. LEVER and GONZALEZ subsequently exited the Sentra. LEVER entered the front passenger seat of UC2's vehicle, while GONZALEZ sat in the rear behind the passenger seat of UC2's vehicle.

21. While inside UC2's vehicle, LEVER provided UC2 a 20 peso Mexican bill containing the previously confirmed serial number [C2916906]. LEVER was subsequently given a paper gift bag (lime green and light blue in color) containing the agreed upon $100,000 U.S. currency. UC2 then confirmed that UC1 would later provide LEVER with the account number

where the laundered proceeds were to be directed. At about this time, LEVER, with GONZALEZ's assistance, began counting the money by hand. While counting LEVER placed the gift bag on the dash of UC2's vehicle, as to block the view from the outside, stating it looked like a gift. UC2 later asked LEVER as to the turn-around time to have the laundered money in the account. LEVER stated that normally it took 7-10 days, but for them [UC1 and associates], in an effort to begin a positive working relationship, it could be even sooner. Each time LEVER counted a quantity of money, that count was then passed to GONZALEZ. In addition, during the meet, UC2 mentioned to LEVER, that if UC2 would have known that LEVER was going to count by hand, UC2 would have brought LEVER a "machine" (implying a money counter). UC2 added that he (UC2) has several and that UC2 would provide a machine next time. LEVER gestured yes as he continued to count the money. In addition, GONZALEZ said "yes". After counting/confirming all $100,000 U.S. currency, LEVER and GONZALEZ exited the vehicle with GONZALEZ carrying the gift bag containing the currency.

22. At approximately 2:25 p.m., agents observed LEVER and GONZALEZ exit UC2's vehicle. LEVER entered the driver's side door of the Sentra and GONZALEZ the front passenger, with gift bag in hand. At about this time the Sentra exited the mall parking area and drove west on U.S. Interstate 8 as observed by law enforcement aerial surveillance. Surveillance of the Sentra continued to downtown San Diego, to the Gas Lamp district where the Sentra entered the Diamond View Tower underground parking structure located at 350 Tenth Ave, San Diego, CA. This address was previously identified as "redhouse creative", a marketing business that identified LEVER as the company CEO, located at 350 10th Ave - 10th floor Suite 1000 San Diego, CA, as mentioned above. Additionally, during LEVER's meet with UC2, he [LEVER] stated that they came from Mexicali, but had an office downtown [San Diego] where they were working.

23. At approximately 3:00 p.m., agents observed LEVER, GONZALEZ and an unidentified Hispanic male (approx. 50 years old) waiting at an elevator door in the underground parking structure. Agents observed the lime green and light blue gift bag in LEVER's hand. At about this time, all three men entered the elevator.

24. At approximately 3:02 p.m., agents observed LEVER and GONZALEZ in the main lobby of the Diamond View Tower where the men entered a controlled area that required identification.

25. At approximately 3:10 p.m., agents confirmed the Sentra was parked, unoccupied in the abovementioned underground parking structure. At approximately 3:54 p.m., agents observed three Hispanic males, one carrying the lime green and light blue gift bag, pass through the Diamond View Tower lobby and enter the garage elevator.

26. At approximately 3:55 p.m., agents observed LEVER, GONZALEZ and the unidentified Hispanic male exit the garage elevator. LEVER once again was carrying the lime green and light blue gift bag. Agents then observed LEVER and GONZALEZ walk toward the Sentra and the unidentified Hispanic male continued to an unidentified vehicle nearby. At approximately 3:57 p.m., agents observed LEVER and GONZALEZ exit the parking garage.

27. Agents followed the Sentra to the Coronado Bridge and into Coronado. Agents subsequently observed the Sentra park at a Wells Fargo bank located at 829 Orange Ave, Coronado, CA. LEVER exited the vehicle and walked to the ATM at the front of the building. At approximately 4:15 p.m., agents observed LEVER at the ATM with a small stack of U.S. dollar bills in hand, depositing $100 bills.

28. At approximately 4:20 p.m., LEVER entered the Sentra and departed the Wells Fargo branch. At about this time LEVER began driving unpredictably and engaging in what appeared to me based on my training and experience to be counter-surveillance by stopping on the side of the road and squaring the block. As a result, surveillance was terminated.

29. At approximately 9:53 p.m., UC2 texted LEVER the necessary account information as to where the $100,000 represented to be drug proceeds to be laundered was to be wire transferred to an undercover bank account.

### D. LEVER WIRE TRANSFERS $85,500 USD TO UNDERCOVER BANK ACCOUNT

30. On July 16, 2019, at approximately 9:08 AM, UC1 contacted LEVER to inquire about the money that was previously picked up. During the call, LEVER stated he was finalizing the wire transfers from one account to the other. LEVER told UC1 to expect the deposit by the end of the day or the following morning. LEVER stated he would contact UC1 from the bank after depositing the funds to confirm receipt.

31. On July 16, 2019, at approximately 10:40 AM, LEVER sent UC1 a text message requesting the following information:
    Business name and address
    Bank Name and address
    Account and Routing number
    ABBA or Swift

32. On July 16, 2019, at approximately 4:06 PM, UC1 texted LEVER the requested information for the undercover bank account. On the same date, LEVER texted confirming he had received the information. LEVER texted: "All set. I will follow up tomorrow."

33. On July 17, 2019, at approximately 11:00 AM, LEVER wired $85,500.00 to the undercover bank account. On the same date, agents confirmed $85,500 had been deposited into the undercover bank account on July 17, 2019 from Comercializadora Bajanorynorte. JP Morgan was listed as the correspondent bank that completed the transaction. Expenses incurred during transaction included the $14,500 USD laundering fee and $15.00 USD bank transaction fee. LEVER kept $14,500 as his 14.5% commission rate instead of 12% as initially stated previously agreed upon.

### E. ADDITIONAL MONEY LAUNDERING ACTIVITIES

34. In September 2019, agents learned from the CS that GONZALEZ and LEVER met with a drug trafficker's associates to coordinate the laundering of several million dollars and that LEVER had met with them in late August 2019, picked up in San Diego $250,000 USD from them to launder as a test run. According to the CS, LEVER transported the money to his San Diego office, counted it, and then LEVER and GONZALEZ smuggled $125,000 USD into Tijuana,

13

Mexico and kept the remaining $125,000 USD in San Diego. A search of LEVER's known vehicle, the Sentra, in CBP databases revealed that on August 7, 2019, August 14, 2019 and August 23, 2019, GONZALEZ and LEVER crossed together in the Sentra through the Calexico East POE. In addition, GONZALEZ and LEVER again crossed together in the Sentra through the Calexico East POE on September 17, 2019.

35. A search of LEVER in CBP databases revealed that he also crossed into the U.S. in the Sentra on the following dates and through the following ports of entry, August 13, 2024 through the San Ysidro POE, August 29, 2024 through the Calexico East POE, August 30, 2024 through the Calexico East POE, September 4, 2024 through the Calexico East POE and September 13, 2024 through San Ysidro POE.

36. In early October 2019, the CS met with LEVER who discussed using property as collateral for this money laundering scheme with the drug traffickers referenced above and that LEVER would be having additional meetings with them in October.

## REQUEST FOR SEALING

37. It is further respectfully requested that this Court issue an Order sealing, until further order of this Court, all papers submitted in support of this complaint, including the probable cause statement and arrest warrants. Sealing is necessary because premature disclosure of the contents of this probable cause statement and related documents may cause the defendants and other targets to flee, may cause destruction of evidence, or otherwise have a negative impact on this investigation.